**SO ORDERED.**

**SIGNED this 03 day of November, 2011.**



*Stephani W. Humrickhouse*
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| **IN RE:** | **CASE NO.** |
| **STEVEN ARTHUR BURTON** | **08-07777-8-SWH** |
| **DEBTOR** | |

### ORDER ALLOWING MOTION TO REOPEN CASE
### AND ALLOWING AMENDMENT OF SCHEDULES

Pending before the court is debtor Steven Arthur Burton's motion to reopen his Chapter 7 case, which was closed on March 29, 2009, and to amend his schedules B and C in order to list a personal injury claim. An objection to the motion was filed by Orange County Ironworks, LLC, Kirchhoff Construction Services, Millbrook School, and Gabriel Steel Erectors, Inc. (hereinafter "Respondents"). A hearing was held in Raleigh, North Carolina, on October 5, 2011. Respondents are located in the State of New York and were represented by both local counsel and, via telephone, their primary counsel. For the reasons that follow, the motion will be allowed.

### BACKGROUND

On March 8, 2007, while employed as an ironworker by Gabriel Steel Erectors, Inc. in Orange County, New York, the debtor fell to the ground from a building then under construction and

sustained serious injuries, including a traumatic brain injury. The debtor thereafter retained counsel to pursue a workers' compensation claim, and a decision awarding compensation was issued by the State of New York Workers' Compensation Board in July 2007. Subsequent to that, the debtor retained counsel to pursue a personal injury claim, which was filed in Duchess County, New York, in May of 2008.[1]

According to medical records submitted to the court by Respondents,[2] the debtor was hospitalized for over a month after the injury, then was admitted to a different hospital, where he underwent acute rehabilitation and inpatient therapy. He was discharged to home care on April 21, 2007. Supp. Aff. of Christopher Massaroni, Ex. B (Tina Berger, CM, CBIS, Initial Status Report, Learning Services (Specialists in Brain Injury Care) at 2 (Aug. 11- Sept. 2, 2008)). The debtor began outpatient therapy at a "supervision level" for eating, ambulating, bathing, and other personal matters, as well as for "language comprehension, expression, [and] social interaction[,] and is minimal assist with problem solving and memory." Supp. Aff. of Christopher Massaroni, Ex. B at 2. A neuropsychological exam in August and September 2007 indicated that the debtor "scored within the normal limits for intelligence testing but had significant impairment of attention, concentration, [and] verbal fluency with substantial delays in responses to unstructured questions." Id. The exam resulted in a recommendation for "increased intensity of rehabilitation efforts for cognitive and

---

[1] Respondents state that the complaint was amended on or about January 13, 2009. At this time, the debtor was involuntarily committed at Central Regional Hospital in Granville County, North Carolina.

[2] As explained below, the legal standard relevant to the court's analysis is whether the debtor's failure to include a personal injury lawsuit as an asset on his schedules comes within the parameters of excusable neglect. The debtor's competency and capacity at certain stages in the bankruptcy case came into question in the hearing. Both the debtor and Respondents submitted medical records bearing on that issue in the context of excusable neglect.

emotional deficits, also rehabilitation for gait problems, and poor visual-motor activities, referral to a psychiatrist for medications for depression, and a repeat neuropsychological evaluation." Id.

Another record offered by Respondents details the debtor's use of heroin from an early age and his treatment with methadone, both of which have occurred intermittently before and after the accident. Supp. Aff. of Christopher Massaroni, Ex. A (Report of Dr. Thomas Gualtieri, Patient Report, Attention & Memory Center North Carolina Neuropsychiatry, PA (Transcribed August 8, 2008)).

> Thereafter, according to the records:
>
> During the year following his discharge home in New York, Mr. Burton began using heroin on a regular basis and was eventually admitted to a drug treatment program Veritas Villa, Inc. in Kerhonkson, NY. He apparently underwent detoxification and then inpatient treatment from 6/7/08 - 6/22/08. The record reflects compliance with treatment but with limitations secondary to the sequelae from the brain injury: memory problems, headaches, visual problems, altered gait, and dysarthric speech. The medical director . . . recommended transfer to a "higher level of care" for treatment of the brain injury.
>
> Upon discharge from Veritas Villa Mr. Burton moved to Prospect Hill, NC with his parents under their care. He is no longer involved with the fiancé and has reportedly maintained sobriety. He currently lives with his family under their supervision. He has not participated in a comprehensive brain injury rehabilitation program since being discharged from the Helen Hayes Hospital in 2007.
>
> Mr. Burton continues to have deficits of attention, memory, [and] executive skills functioning along with recent inpatient drug treatment. Mr. Burton was admitted to [Learning Services] on August 11, 2008.

Supp. Aff. of Christopher Massaroni, Ex. B at 2. The reports from Learning Services indicate that the debtor was aware that his financial situation was not ideal, as evidenced by the fact that he told a Learning Services staff member that he received workers' compensation, had applied for disability, and needed to file for bankruptcy. Id. Ex. C at p. 2 (Entry for Sept. 19, 2008, in which the debtor also received advice with respect to safe ways to carry wallet).

3

The debtor filed a petition under chapter 7 of the Bankruptcy Code on November 4, 2008. Debtor's counsel ("Counsel") stated at the hearing that he personally conducted the debtor's office intake procedures, and the debtor disclosed the fact of the accident and the existence of litigation proceeding from it. The debtor appeared to be physically healthy but required his then-girlfriend's assistance to fully participate in the intake process. Other than the workers' compensation litigation, the debtor's case appeared to be what would colloquially be referred to as a "vanilla" no-asset chapter 7.[3]

Unfortunately, when preparing the petition and schedules, Counsel did not inquire of the debtor whether there might be more than one lawsuit in connection with the debtor's accident. This was so because, as Counsel explained at the hearing, under North Carolina law, the existence of a workers' compensation lawsuit precludes the existence of a separate personal injury lawsuit arising out of the same work-related incident. New York law is different, and allows prosecution of both. As Counsel candidly conceded, he simply "did not think to ask" about the existence of other lawsuits based on his mistaken assumption that the existence of the debtor's workers' compensation case basically answered that unasked question by precluding other litigation arising from the same accident. It is Counsel's strong impression that the debtor did not seek to hide the existence of the personal injury lawsuit, but was instead unaware of the relevance of there being two distinct lawsuits and of the need to separately disclose them. If he had known about the personal injury suit, Counsel stated, he would at that time have ensured that the suit was included as an asset on the debtor's

---

[3] In the debtor's chapter 7 case, there were unsecured nonpriority claims totaling approximately $48,000, a significant portion of which were incurred in connection with the debtor's medical needs. The debtor's only income was, and is, $1,777 per month in workers' compensation.

4

schedules. He also would have informed the debtor that under North Carolina law, the debtor could claim the proceeds of that lawsuit as 100% exempt.

The debtor's condition deteriorated not long after the petition was filed. He was involuntarily admitted for inpatient psychiatric care on January 9, 2009, discharged on January 22, then admitted again on January 28, 2009. The debtor's condition was such that he engaged in repeated and intensive self-injurious behavior, including attempts at self-strangulation. A guardian ad litem was appointed on February 20, 2009. During this time the debtor, being hospitalized, could not appear at scheduled § 341 meetings and, on debtor's counsel's motion, instead supplied written responses to interrogatories. The trustee filed a report of no distribution and a discharge was entered on March 9, 2009. On April 7, 2009, the debtor was adjudged incompetent by order of the Caswell County Superior Court.

The instant motion was filed on August 1, 2011, and an amended motion was filed on August 16. Counsel filed the motion when the omission in the schedules was brought to his attention by the debtor's New York counsel, who had been informed of the omission by Respondents. The Respondents had themselves become aware of the omission when reviewing the debtor's deposition testimony, at which time, they realized, the debtor had disclosed to them the existence of the North Carolina bankruptcy case. Respondents now maintain that the debtor's attempt to reopen the case is "inexplicably" late and suggest that the debtor is attempting to do so essentially because he got caught. Through Counsel, the debtor counters that he is attempting to correct the schedules at this time only because he had no idea that there was an omission in them until the error was brought to his attention. The debtor maintains that the error was wholly inadvertent and is the result of excusable neglect.

**DISCUSSION**

There is no dispute that the debtor's personal injury suit is an asset of the bankruptcy estate and should have been listed on the debtor's schedules. The debtor now moves to reopen the case, and seeks to amend his schedules to include the personal injury claim. Respondents object.[4]

**I.     Reopening of Case**

Whether to reopen the case "to administer assets, to accord relief to the debtor, or for other cause" as authorized by 11 U.S.C. § 350(b) is within the discretion of the court, the exercise of which "depends upon the particular circumstances of the case." In re Hamlett, 304 B.R. 737, 740 (Bankr. M.D.N.C. 2003), citing Hawkins v. Landmark Finance Co., 727 F.2d 324, 326 (4th Cir. 1984). It is "generally recognized that a bankruptcy court does not abuse its discretion when it reopens a closed case to administer a newly-discovered asset and, in fact, may have a duty to do so." Id., citing In re Mullendore, 741 F.2d 306, 308 (10th Cir. 1984); In re Tarrer, 273 B. R. 724, 732 (Bankr. N.D. Ga. 2001).

In this case, the court will exercise its discretion to reopen the case. This court, like the bankruptcy court in Hamlett, finds the question to be an easy one. In Hamlett, the debtor sustained an injury when he stepped in a hole near a Duke Energy power pole. He indicated to Duke, through counsel, that he contemplated filing a lawsuit. Before filing suit, the debtor commenced a chapter 7 case and received a discharge. The debtor continued to informally pursue a claim against Duke but,

---

[4] There is an argument to be made that the Respondents lack standing to assert objections to this motion, given that they are not creditors or parties in interest with respect to the debtor's chapter 7 case. See In re Free, 2001 WL 1806033 (Bankr. D.S.C. 2001) at *3 (reopening bankruptcy case, appointing trustee, and noting that the objecting parties, which were defendants in the debtor's undisclosed personal injury lawsuit, had no "legitimate standing" in the matter). In light of the court's disposition of this matter and the fact that the issue was not raised by the parties, the court does not make a determination on the issue at this time.

before he actually filed suit, Duke adopted the position that the debtor was estopped from bringing the claim because the debtor failed to list his claim against Duke in his bankruptcy schedules. Id. at 739-40. The Hamlett court reopened the case, concluding that upon the filing of the petition, the tort claim became property of the estate pursuant to 11 U.S.C. § 541(a); that the claim was not abandoned upon closure of the case, because the claim was not scheduled; and that the claim remained property of the estate pursuant to 11 U.S.C. § 554(d). See generally Hamlett, 304 B.R. at 740-41.

The same line of reasoning applies in the case. In some instances there are policy concerns that weigh against reopening a case, but the court sees no basis on which to refrain from doing so in this one. Respondents are substituting those factors that may weigh against allowing a debtor to *claim an exemption* in place of those that weigh against *reopening a case*. In this case, as in Hamlett, "there is no reason to adopt an argument that ignores the interest of the creditors in this case and would result in a windfall victory for [the state court defendant] with respect to the tort claim." Id. at 742. The trustee supports reopening of the case, because the debtor's potential recovery would be more than enough to satisfy the filed claims. The only party who could conceivably benefit from the court's refusal to open the case would be the Respondents, who would be relieved of their obligation to defend the personal injury suit in New York. Because this result would not further the goals of an efficient and just administration of the bankruptcy process but, instead, wholly contradict it, the case will be reopened.

## II.     Amendment of Schedules

The next issue is whether the debtor should be allowed to amend his schedules.  A debtor may, as a matter of course, amend a voluntary petition or schedules at any time before the case is closed.  Fed. R. Bankr. P. 1009(a).  After closure the debtor has no absolute right to amend, but the court has discretion to allow the debtor to do so if the debtor's failure to act before the case was closed is attributable to excusable neglect.  Fed. R. Civ. P. 9006(b)(1); see, e.g., In re Dunn, 2010 WL 2721201 (Bankr. E.D.N.C. 2010).  As the Dunn court explained:

> When determining whether excusable neglect has been shown, the Fourth Circuit relies on the two-prong test set forth by the Supreme Court in Pioneer Investment Services v. Brunswick Associates, 507 U.S. 380, 113 S. Ct. 1489, 123 L. Ed.2d 74 (1993).  Thompson v. E.I. DuPont de Nemours & Co., Inc., 76 F.3d 530, 533 (4th Cir. 1996).
>
> To satisfy the first prong of the test, the omission must result from neglect; the second prong requires that the neglect be "excusable."  Pioneer, 507 U.S. at 388, 395.  Neglect is defined with reference to Webster's Dictionary as "to leave undone or unattended to especially through carelessness," and includes situations where a party misses a deadline through "inadvertence, miscalculation, or negligence." Id. at 388.  In finding that neglect is "excusable," the court must make an equitable determination taking account of the totality of the circumstances, including:
>
>> the danger of prejudice to the [opposing party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.
>
> Id. at 395.  This 'elastic concept' does not require rigid application of these factors, nor does it render determinative whether the error was caused by circumstances outside the party's control.  See id. at 392; Wilmoth, 412 B.R. at 797.

Dunn, 2010 WL 2721201 at *2. This case is similar to the Dunn matter[5] in some, but not all, respects. The circumstances surrounding Counsel's mistaken conclusion and the basis on which he overlooked the possible existence of a second suit already have been discussed, and this aspect of the omission is within the realm of excusable neglect.

The court is of the view that the debtor, like Counsel, acted in good faith. Respondents contended that the debtor "had the requisite motive to conceal the Personal Injury Action based upon the fact that he would not be harmed by his nondisclosure unless an adversary uncovered his prior bankruptcy and challenged the incomplete disclosure." Respondents' Mem. in Support of Objection at 8-9. This generic assertion of motive could be true of any debtor with a potentially valuable lawsuit outside of bankruptcy. When the court inquired at the hearing whether Respondents *specifically alleged that this debtor intentionally sought to conceal the existence of the personal injury suit*, though, they averred in response that they believe the debtor had some "baseline notion" that he had a claim that he could lose, and that the debtor may have incorrectly believed that if he didn't disclose it, then he wouldn't lose it. Respondents' explanation at that hearing that it is "more probable than not that that's what was going on" demonstrates that the basis for Respondents' attribution of this motive to the debtor is, simply, a hunch .

---

[5] In Dunn, questions of whether the debtor's first or second attorney were informed of the lawsuit were overshadowed by the "ineptitude of the debtor's substitute counsel taken in combination with the mental infirmity caused by the debtor's various afflictions and prescription medications," which together suggested that "the omission was an oversight rather than the result of any fraudulent agenda." Id. The Dunn court concluded that in all probability, the debtor in that case had simply not opted out of a certified class. That debtor had not retained counsel or initiated a lawsuit of his own. In this case, in contrast, the debtor did retain counsel for the personal injury lawsuit, and debtor's bankruptcy counsel is exceedingly competent.

In this case, medical records submitted by both Counsel and Respondents indicate that what was, in fact, going on was the debtor's recovery from his injury under circumstances that are inconsistent with Respondents' hunches.  Respondents submitted records which, they maintain, establish that as of August 2008, the debtor had made a "remarkable recovery from a severe brain injury" and has "few if any sensorimotor or cognitive deficits."  Respondents' Supp. Aff. of Christopher Massaroni at 5 (quoting Ex. A, appended report of Dr. C. Thomas Gualtieri).  Other contemporary reports from staff members at Learning Services, Inc. and cited by Respondents reflect that in September, the debtor stated in conversations that he "need[ed] to file bankruptcy."  To Respondents this indicates that "[c]learly, Debtor was fully aware of his financial situation and was able to articulate it to staff."  Id. at 6-7.  Finally, in a letter dated December 15, 2008 (which Respondents correctly point out was "during the pendency of Debtor's bankruptcy case"), another doctor familiar with the debtor's medical needs opined that the debtor was "very intelligent and able to handle most aspects of his daily routine." Id. at 8 (quoting appended letter of Dr. Harvey Jacobs).

With respect to the debtor's capacity, the Respondents' selected quotations are inapposite to the overall import of the materials that they themselves provided.  The report of Dr. Gualtieri states that the debtor "has made a remarkable recovery, *but he does have persistent and severe deficits*." Id. Ex. A, p. 1.  Dr. Gualtieri's summary and impressions establish that the debtor's medical team is "still not fully cognizant of the impact that this injury will have had." Id. Ex. A, p. 7. The last record supplied by Respondents (Ex. D, Letter from Dr. Jacobs  (Dec. 15, 2008)) notes that the debtor had been removed from the Learning Services program because "several weeks ago his apparent mis-perception of events regarding another resident's circumstances . . . resulted in his reportedly becoming very upset and anxious," then threatening others.  Dr. Jacobs noted that "[t]o

10

this day, he has an incomplete perception of events leading up to the episode and his role in the situation. The problem is that as a result of his brain injury, Mr. Burton is more likely to respond in this manner to a variety of issues that could jeopardize his safety and community tenure."

In fact, as the documents provided by the debtor establish, the debtor's condition continued to deteriorate during the course of his bankruptcy case. See supra p. 5. After full review, the court concludes that these materials indicate, unequivocally, that the debtor's injury, coupled with other medical and personal issues discussed in the medical records, affected his memory and cognitive abilities in ways that this court believes would cause preparation of a bankruptcy petition to be an unusually and exceedingly difficult task. There is every indication that the debtor was candid and forthcoming with his attorney and that Counsel prepared a petition on the debtor's behalf that sought to include all relevant and required information, and there has been no evidence or proffer of evidence to the contrary. Unfortunately, mistakes do happen.

In this case, it appears to the court that Counsel's incorrect assumption about the preclusive effect of the workers compensation action, working in tandem with the debtor's incorrect assumption that disclosing the accident and the fact of litigation ensuing from it captured the relevant details for purposes of the petition, aligned in an unfortunate way and resulted in the omission at issue. Neither debtor nor his lawyer were well placed to perceive the other's mistake. There is absolutely no evidence from which the court can infer bad intent of any kind on the part of the debtor or Counsel. In fact, the debtor had nothing to gain by omitting the personal injury assets because assets of that nature are fully exemptible under North Carolina law.[6] N.C. Gen. Stat. § 1C-

---

[6] To the extent that New York state law is the relevant exemption law, Counsel has stated that no exemption will be claimed and full recovery will be available for the estate.

1601(a)(8). Against this backdrop, the court is left with the overriding impression, based on the totality of the circumstances, that a simple error was committed due to excusable neglect.

The court will allow the debtor to amend his schedules to list the New York state lawsuit, and will reappoint the trustee to administer the proceeds of that lawsuit, if any, as assets of the chapter 7 estate. It is readily apparent that reopening the case to add the asset is in the best interest of all creditors and the bankruptcy estate, as well as the debtor. See, e.g., In re Free, 2001 WL 1806033 (Bankr. D.S.C. 2001) at *3.

For the foregoing reasons, the debtor's motion to reopen his chapter 7 case will be **ALLOWED**. The debtor's motion to amend his schedules also is **ALLOWED** and Holmes P. Harden is reappointed as Chapter 7 trustee. If the debtor claims any exemption as to which the trustee or any creditor or party in interest objects, the objecting party may file an objection within thirty days of the date on which the exemption was claimed.

**SO ORDERED**.

END OF DOCUMENT